1

1     UNITED STATES DISTRICT COURT

2     EASTERN DISTRICT OF NEW YORK

3     - - - - - - - - - - - - - - X

4     UNITED STATES OF AMERICA,  :

                                          CR-09-582

5             -against-                United States Courthouse

6                              :      Brooklyn, New York

7     ERIC SEIDEN,

8             Defendant.

9                              :      September 24, 2009
                                          2:30 o'clock p.m.

10    - - - - - - - - - - - - - - X

11    TRANSCRIPT OF CRIMINAL CAUSE FOR PLEADING
      BEFORE THE HONORABLE I. LEO GLASSER

12    UNITED STATES DISTRICT JUDGE

13    ATTORNEYS FOR GOVERNMENT:
      BENTON CAMPBELL

14    United States Attorney
      BY:  SCOTT KLUGMAN

15         JAMES McMAHON
      Assistant United States Attorneys

16    271 Cadman Plaza East
      Brooklyn, New York 11201

17

18    ATTORNEY FOR DEFENDANT:
      FEDERAL DEFENDERS of NEW YORK

19    BY: DEIRDRE VON DORNUM, ESQ.

20

      Court Reporter:
21    Marsha Diamond
      225 Cadman Plaza East
22    Brooklyn, New York
      TEL: (718) 613-2489
23    FAX: (718) 613-2369

24        Proceedings recorded by mechanical stenography,
      transcript produced by CAT.

25

1          THE CLERK:  Criminal cause for sentencing: United

2    States versus Eric Seiden.

3          Docket No. CR 09-582.

4          Counsel, state your appearances for the record.

5          MR. KLUGMAN: For the government, Scott Klugman and

6    James McMahon. Good afternoon.

7          MS. VON DORNUM: Federal Defenders, by Deirdre Von

8    Dornum.  Good afternoon.

9          THE COURT:  Would you swear the defendant.

10    E R I C   S E I D E N,

11          having been first duly sworn/affirmed, was examined

12          and testified as follows:

13          THE COURT:  Mr. Seiden, you just swore to tell the

14    truth, so everything you're going to say to me this afternoon

15    must be truthful because if you tell a lie after you swore to

16    tell the truth you may be committing the crime of perjury.

17          Do you understand that?

18          THE DEFENDANT:  I do.

19          THE COURT:  How old are you?

20          THE DEFENDANT:  Thirty-eight.

21          THE COURT:  How far have you gone in school?

22          THE DEFENDANT:  Completed high school and I went

23    five years in college.

24          THE COURT: Are you currently being treated by a

25    physician?

1                THE DEFENDANT:  Yes.

2                THE COURT:  For what?

3                THE DEFENDANT:  Drug and alcohol addiction.

4                THE COURT:  Have you taken any drugs or alcohol

5     within the past few days?

6                THE DEFENDANT:   No.

7                THE COURT:  Have you ever been treated or

8     hospitalized for any mental or emotional disorder?

9                THE DEFENDANT:   No.

10               THE COURT:  Do you understand why you're here?

11               THE DEFENDANT:  Yes.

12               THE COURT:  Have you understood everything I have

13    said to you so far?

14               THE DEFENDANT:  Yes.

15               THE COURT:  Ms. Van Dorm, are you satisfied with the

16    competence of your client to participate in this proceeding?

17               MS. VON DORNUM:   I am, Your Honor.

18               THE COURT:  I'll make a finding to that effect.

19               I'm told you that wish to plead to a charge which

20    reads that you were a resident of Boca Raton, Florida and

21    between the fall of 2006 and the spring of 20008 you were

22    employed as a stockbroker at a brokerage firm in Florida.  You

23    held Series 7 and 63 stockbroker licenses issued by the

24    National Association of Securities Dealers. You agreed with

25    others to create false demand for, and thereby increase the

4

1  share prices of, various stocks by generating orders to buy

2  those stocks which will be referred to hereafter as the

3  subject securities.

4       Those securities were subject to manipulation in

5  that manner due to their relatively low share price and

6  trading volumes, and some of the subject securities were

7  registered under section 12 of the Securities and Exchange Act

8  of 1934, referred to hereafter as Registered Subject

9  Securities.

10       You called stockbrokers at brokerage houses located

11  throughout the United States and falsely identified yourself

12  as an actual employee of an institutional client of the

13  brokers such as a hedge fund. In some cases you provided the

14  brokers with actual account numbers for their clients. You

15  misappropriated the information about the identities of those

16  clients and their employees and account numbers from the

17  brokerage firm.  After falsely identifying yourself, you

18  placed orders to buy large amounts of the subject securities,

19  including the following:

20       On or about November 18th of 2008 you, together with

21  John Doe Number One, an individual whose identity is known to

22  the United States Attorney, called a brokerage house and

23  fraudulently caused it to buy 40,000 shares of Action Products

24  International Incorporated, referred to hereafter as APII.

25       On or about November 20th of 2008 you called a

1   brokerage house, fraudulently caused it to buy 20,000 shares
2   of APII.
3           On or about May 11th of 2009 you called a brokerage
4   house and fraudulently caused it to buy five million shares of
5   Nutri-Pure Beverages, which will hereafter be referred to as
6   NBVG.
7           On or about May 12 of 2009 you called a brokerage
8   house and fraudulently caused it to buy five million shares of
9   NBVG.
10          On or about May 19th of 2009 you called a brokerage
11  house and fraudulently caused it to buy seven hundred thousand
12  shares of ALENTUS, and ten million shares of NBVG.
13          On or about May 28, 2009 you called a brokerage
14  house and fraudulently caused it to buy twenty-four point
15  five million shares of NBVG.
16          On or about June 5th of 2009 you called a brokerage
17  house located in the Eastern District of New York and
18  fraudulently caused it to buy one billion shares of Sunrise
19  Consulting Group.
20          On or about June 10, 2009 you called a brokerage
21  house and fraudulently caused it to buy one hundred thousand
22  dollars worth of the common stock Zevotek, which amounted to
23  approximately fifteen million shares.
24          On or about June 16, 2009 you called a brokerage
25  house and fraudulently caused it to buy seven point five

1    million shares of Zevotek.

2             On or about June 22, 2009 you called a brokerage

3    house and fraudulently caused it to buy ten million shares of

4    Universal Property Development and Acquisitions Corporation,

5    referred to hereafter as UPDV.

6             On or about June 25, 2008 you called a brokerage

7    house and fraudulently caused it to buy eighteen million

8    shares of UPDV.

9             On or about June 26, 2009 you called a brokerage

10   house and fraudulently caused it to buy twenty million shares

11   of UPDV.

12            On or about July 7, 2009 you called a brokerage

13   house and fraudulently caused it to buy eighty million shares

14   of UPDV.

15            On or about July 8, 2009 you called a brokerage

16   house and fraudulently caused it to buy ninety-five million

17   shares of UPDV.

18            Many of your calls to the brokerage houses were

19   recorded. On a number of those calls you claimed that you were

20   out of your office attending a conference, playing golf or

21   fishing, and that your wife was giving birth to explain why

22   the brokerage houses needed to contact you on a cellular

23   telephone.

24            On some calls you shouted, "great shot," or "great

25   catch ," to fictitious golf or fishing partners, to give

7

1  credibility to your false statement that you were out of your

2  office.

3           In order to avoid detection you used disposable

4  cellular telephones in false names for calls to and from the

5  brokerage houses.

6           You changed cellular telephones about once a week

7  throughout the scheme. You called more than twenty brokerage

8  houses to carry out this scheme and caused those brokers to

9  execute more taken one point eight million in orders to buy

10 the subject securities.

11          Once you generated false demand for the subject

12 securities John Doe Number Two, a former executive of UPDV,

13 whose identity is known to the United States Attorney, John

14 Doe Number Three, a stock promotor whose identity is known to

15 the United States Attorney and others, sold shares of the

16 subject securities that they owned or controlled at times at

17 fraudulently inflated prices. These individuals paid kickbacks

18 to you for your efforts to create a demand for and increase

19 the share price of subject securities in amounts ranging from,

20 approximately, ten to thirty percent of the money they

21 obtained by selling shares of the subject securities they

22 owned or controlled.

23          In or about and between October of 2008 and July of

24 2009, both dates being approximate and inclusive, within the

25 Eastern District of New York and elsewhere, you together with

1   others, knowingly and intentionally conspired to secure a

2   scheme and artifice to defraud persons in connection with the

3   registered subject securities and to obtain by means of

4   materially false and fraudulent pretenses, representations and

5   promises, money and property in connection with the purchase

6   and sale of the registered subject securities, contrary to

7   Title 18 section 1348 of United States Code, and to devise a

8   scheme and artifice to defraud and to obtain money and

9   property by means of materially false and fraudulent

10  pretenses, representations and promises, and for the purpose

11  of executing such scheme and artifice to transmit and cause to

12  be transmitted by means of wire communication and interstate

13  and foreign commerce, writings, signs, signals, pictures and

14  sounds, contrary to section 1343 of Title 18 of the United

15  States code.

16          Now, if you look at the paper in which that charge

17  is contained, Mr. Seiden, you'll find that on the upper

18  right-hand side of that page in capital letters is the word

19  INFORMATION; do you see that?

20          THE DEFENDANT:  Yes.

21          THE COURT:  Now, if you go down the page a little

22  bit immediately below the caption, you will see the words:

23  The United States Attorney charges.

24          Do you see that?

25          THE DEFENDANT:  I do.

9

1      THE COURT:  Now, I call that to your attention

2  because the crime with which you're charged is a capital

3  offense as that term is used in the Constitution of the United

4  States.

5          Capital offense is more commonly known as a felony.

6  It's a crime punishable by imprisonment of more then a year.

7  You are charged with a capital offense, and the Constitution

8  of the United States provides that a person who is charged

9  with a capital offense has a right to insist that he be

10  charged by a grand jury and grand jury make such charge in a

11  document which is called an indictment.

12          You are not being charged by the grand jury as I

13  just indicated to you, you are being charged by the United

14  States Attorney, and the document which contains that charge

15  is not an indictment, but it's an introduction.  I'm sorry.

16  It's an information.

17          Now, you have a right to say to me today that you'd

18  like to enjoy the right which the Constitution of the United

19  States gives you, which is to be charged by a grand jury and

20  charged in an indictment. You also have the right to say to me

21  I waive the right which the Constitution gives me. I consent

22  to being charged by the United States Attorney in an

23  information.

24          For the purpose of making some informed judgment as

25  to whether you wish to waive an indictment by the grand jury,

1    let me briefly tell you what a grand jury is and when a grand

2    jury returns an indictment.

3              A grand jury is a made up of not less than sixteen

4    nor more than twenty-three persons, and after evidence has

5    been presented to the grand jury if, at least, twelve of those

6    people have probable cause to believe that a person committed

7    a crime, they will return an indictment, but if you say to me

8    that I would like to enjoy my constitutional right to be

9    charged by a grand jury in an indictment, I suspect what would

10   happen would be that the United Attorney's Office will cause a

11   grand jury to be impanelled. They will present this evidence

12   to that grand jury, and request that the grand jury return an

13   indictment. I don't know whether a grand jury will or will

14   not. That will depend upon whether at least ten -- twelve

15   members of that body had probable cause to believe that you

16   committed this crime.

17             Do you understand everything I've just said to you?

18             THE DEFENDANT:  Yes, I do.

19             THE COURT:  You've discussed all that with

20   Ms. Von Dornum?

21             THE DEFENDANT:  Yes, I have.

22             THE COURT:  Do you understand your right to be

23   indicted by a grand jury?

24             THE DEFENDANT:  Yes, I do.

25             THE COURT:  Do you want to insist on that right or

1    do you want to give it up, do you want to waive it?

2                THE DEFENDANT:  I would like to waive it.

3                THE COURT: I have a waiver of indictment here. Has

4    Mr. Seiden executed it?

5                MS. VON DORNUM:   He has, Your Honor.

6                THE CLERK:  Yes, Judge.

7                THE COURT:  And that's your signature?

8                MS. VON DORNUM:   It is, Your Honor.

9                THE COURT:  As a witness to it.

10               Mr. Seiden has been fully advised of his right to be

11    indicted by a grand jury.  I'm satisfied he understood it, and

12    with that knowledge and understanding, he knowingly and

13    voluntarily waived that right.  He's executed a waiver of

14    indictment which I'll accept and direct that it be filed.

15               Now, before I can accept your plea, which I

16    understand you wish to enter to the information which I just

17    read to you, I'm required to make sure that you understand a

18    variety of rights that you have as you stand here this

19    afternoon.  And the first thing I want to make sure you

20    understand is that you have the right to say to me that you're

21    not guilty of this charge, and if you do say that to me, there

22    will be a public trial, a trial that will be held within the

23    time the law requires trials to be held. It will be a trial to

24    a jury of twelve persons.  You will be represented by your

25    lawyer at that trial, and at that trial you'd be presumed

1   innocent of this charge.

2          What that means is that you would not have to prove

3   your innocence and you'll presumed that you are.  You wouldn't

4   have to prove anything.  The government would have to prove

5   your guilt, and the government would have to prove it so a

6   that unanimous jury of twelve persons would be satisfied

7   beyond a reasonable doubt that you're guilty.

8          Do you understand that?

9          THE DEFENDANT:  I do.

10          THE COURT:  At that trial you would have the right

11   to confront your accusers. You would have the right to see who

12   the witnesses against you would be. Your lawyer would have the

13   right to cross-examine those persons for you. She'd have the

14   right to object to any evidence which she believes the court

15   shouldn't receive.

16          Do you understand that?

17          THE DEFENDANT:  I do.

18          THE COURT: And at that trial, you could, if you

19   wanted to, testify under oath on your own behalf. You could

20   have witnesses summoned here to testify for you. You could

21   offer such evidence at your trial as you think might be

22   helpful to you, but you needn't do any of those things. You

23   have a right to remain silent at your trial, say nothing, and

24   do nothing; and if you did remain silent at your trial, and

25   did nothing else, offered no evidence on your behalf, I would

1  instruct the jury that they must not think that you're guilty

2  because you've remained silent, offered them no testimony for

3  yourself or offered no evidence on your behalf. I would

4  instruct the jury that you're exercising a right which the

5  Constitution of our country gives you. It's known as the

6  privilege against self-incrimination. In simpler terms, it

7  means that a person can't be compelled to convict themselves

8  out of the words of his own mouth.

9         If you plead guilty today, and if I accept your

10  plea, you'll be giving up all those rights which I have just

11  explained to you. There will not be a trial.  The government

12  will not be called upon to prove that you are guilty of this

13  crime and prove it to the satisfaction of the unanimous jury

14  beyond a reasonable doubt, and you will not have had the

15  opportunity to see who the witnesses against you are. A

16  finding of guilt will be entered and sentence will be imposed

17  on another day.

18         Do you understand all that?

19         THE DEFENDANT:  I do.

20         THE COURT:  If you are were listening carefully,

21  Mr. Seiden, you would have heard me say if you plead guilty

22  and if I accept your plea, and what I had in mind when I said

23  if I accept your plea was the requirement which the law

24  imposes upon me to make sure that I'm not accepting a plea of

25  guilty from a person who is not, and so, I will be asking you

1    some questions about the crime of which you are charged.  To

2    the extent that you answer them, you'll have waived your right

3    to remain silent and might be convicting yourself out of the

4    words of your own mouth.

5              Do you understand all that?

6              THE DEFENDANT:  I do.

7              THE COURT:  Did Ms. Von Dornum tell you that the

8    maximum sentence which the crime which you are charged with

9    violating provides for is imprisonment up to 25 years?

10             THE DEFENDANT:  She did.

11             THE COURT:  Did she also tell you that in addition

12   to any term of imprisonment the Court could add a period of

13   supervised release of up to five years?

14             THE DEFENDANT:  She did.

15             THE COURT:  Did she explain what supervised release

16   means?

17             THE DEFENDANT:  She did.

18             THE COURT:  Do you believe you understand it or do

19   you want me to explain it to you?

20             THE DEFENDANT:  I believe I understand it.

21             THE COURT: Did she also tell you that you could be

22   fined up to two hundred fifty thousand dollars or twice the

23   gross gain or loss, whichever is higher?

24             THE DEFENDANT:  Yes.

25             THE COURT:  Did you she also tell that you will be

1  required to make restitution in an amount which will be

2  decided upon later?

3          THE DEFENDANT:  Yes.

4          THE COURT:  Do you understand what restitution

5  means?

6          THE DEFENDANT:  I do.

7          THE COURT:  And did she also tell you that,

8  regardless of what the sentence is, you'll be required to pay

9  a special assessment of one hundred dollars which is

10  mandatory?

11          THE DEFENDANT:  Yes.

12          THE COURT:  Did she tell you that?

13          THE DEFENDANT:  Yes.

14          THE COURT:  Now, did Ms. Von Dornum have some

15  discussion with you about the guidelines, what they are all

16  about?

17          THE DEFENDANT:  Yes.

18          THE COURT:  Did she explain to you that I will be

19  required to consult a rather thick book called the United

20  States Sentencing Guidelines for the purpose of being advised

21  as to what an appropriate sentence in your case should be, did

22  she tell you that?

23          THE DEFENDANT:  Can you repeat that, sir?  I'm

24  sorry.  Can you repeat the question?

25          THE COURT:  Did she tell you that I would be

1    required to consult the United States Sentencing Guidelines, a

2    rather thick book, for the purpose of getting some advice as

3    to what an appropriate guideline in your case should be?

4                THE DEFENDANT:  Yes, she did.

5                THE COURT:  Was some estimate or prediction made for

6    you as to what the guidelines in your case might be?

7                THE DEFENDANT:  Yes.

8                THE COURT:  I want to make sure that you understand

9    that whatever you were told about, that is just that, a

10   prediction, an estimate, an educated guess which is not

11   binding on me. I have no idea as I talk to you this afternoon

12   what your sentence will be. I will not have any firm idea

13   about that until after I have had an opportunity to read the

14   presentence report.

15              Do you know what a presentence report is?  Do you

16   know what a presentence report is?

17              THE DEFENDANT:   No.

18              THE COURT: When these proceedings are concluded,

19   sometime thereafter, you'll be invited to discuss virtually

20   your entire life's history with the probation officer who will

21   prepare a report which will tell me where you were born, when

22   you were born, your family constellation, your education, your

23   criminal history, if any, your employment history, medical,

24   social history, all the rest of it, and only after I have had

25   an opportunity to study that will I know with some degree of

1    certainty what an appropriate sentence in your case might be.

2              Do you understand that now?

3              THE DEFENDANT:  I do.  Thank you.

4              THE COURT:  Do you have any questions about anything

5    I've explained to you so far?

6              THE DEFENDANT:  No, sir.

7              THE COURT: Ms. Von Dornum, do you have any reason to

8    believe that your client has a defense or any other reason not

9    to plead guilty to this information?

10             MS. VON DORNUM:   I know of no reason, Your Honor.

11             THE COURT:  How do you plead to the charge that I

12   read to you, Mr. Seiden, do you plead guilty or not guilty?

13             THE DEFENDANT:  I plead guilty.

14             THE COURT:  Is there anybody forcing you to tell me

15   that here today?

16             THE DEFENDANT: No, Your Honor.

17             THE COURT:  You are telling me that voluntarily?

18             THE DEFENDANT:  Yes.

19             THE COURT:  And you've entered into an agreement

20   with the government in consideration of that plea?

21             THE DEFENDANT:  Yes.

22             THE COURT:  You've discussed that agreement in some

23   detail with Ms. Von Dornum?

24             THE DEFENDANT:  Yes.

25             THE COURT:  Would you like me to go over that

1   agreement with you?

2          THE DEFENDANT:  No, sir.

3          THE COURT: I want to show you a page of that

4   agreement and ask you whether you recognize any signature on

5   it.

6          THE DEFENDANT:  I do, Your Honor.

7          THE COURT:  Whose signature do you recognize?

8          THE DEFENDANT:  Mine.

9          THE COURT:  And is there some legend written

10  immediately above your signature that you read and agreed to

11  when you signed it?

12         THE DEFENDANT:  Yes.

13         THE COURT: What does that say?

14         THE DEFENDANT:  I have read the entire agreement and

15  discussed it with my attorney.  I understand all of its terms

16  and entering into it knowingly and voluntarily.

17         THE COURT:  And you're satisfied with the

18  representation you've been receiving from your attorney?

19         THE DEFENDANT:  Yes, sir, Your Honor.

20         THE COURT: Now, sometime between October 2008 and

21  July of 2009 you were engaged in some activity which causes

22  you to be here today.  What was it you did that brings you

23  here today?

24         THE DEFENDANT:  Well, between 2008 and 2009 I agreed

25  with others to create a false demand for various stocks in

1    order to create liquidity and to increased volume in daily

2    trading of the stocks.  I made materially false statements in

3    connection with buying various stocks.  I did so over the

4    telephone and electronic communications.  Some parts of this

5    took place in Long Island.

6              THE COURT: These representations were made somewhere

7    within the Eastern District of New York, which includes

8    Brooklyn, Queens, Nassau and Suffolk Counties?

9              THE DEFENDANT:  Yes.  One of the brokerage houses I

10   called was in Long Island.

11             THE COURT:  All that happened between 2008 and 2009?

12             THE DEFENDANT:  Yes, Your Honor.

13             THE COURT:  When you agreed with these other parties

14   to commit this fraudulent scheme and execute it, you

15   understood what it was that you were agreeing to?

16             THE DEFENDANT:  Yes.

17             THE COURT: You agreed to it voluntarily, knowingly?

18             THE DEFENDANT:  Yes, Your Honor.

19             THE COURT:  Mr. Klugman, is there anything else?

20             MR. KLUGMAN:  No, Your Honor, nothing from the

21   government.  The allocution is sufficient.

22             MS. VON DORNUM:   Nothing, Your Honor.

23             THE COURT:  Mr. Seiden has been fully advised of his

24   rights.  I am satisfied he understood them, and with that

25   understanding he knowingly and voluntarily pleaded to an

1    information which is numbered CR-09-582.  There's a factual

2    basis for that plea and I will accept it.

3            Do we have a date?

4            THE CLERK:  January 5th, 2010 at 10:00 a.m. as a

5    control date.

6            THE COURT:  I'm sorry.

7            THE CLERK:  January 5th at 10:00 a.m.

8            THE COURT:  Is that date satisfactory?

9            MR. KLUGMAN:  Yes, Your Honor.

10           MS. VON DORNUM:   Yes, Your Honor.

11           THE COURT:  I take it that Mr. Seiden has been at

12   large on bail?

13           MR. KLUGMAN:  Yes, Your Honor.

14           MS. VON DORNUM: Your Honor, I have one application

15   and in that regard. Mr. Seiden is on bail and is residing in

16   Florida where his home is. He's he been interviewing for

17   various jobs. One of the jobs that he is hoping he'll get

18   hired at involves sale of a commodity.  At the time that he

19   was released on bail a condition was agreed to that he would

20   not work in the securities field. While this is not strictly a

21   securities field, this is a sale of commodity, and pretrial

22   down in Florida has raised some potential concerns with it

23   just because of the closeness of the employment field. So that

24   pretrial can feel secure, but also, so that you know what's

25   happening, I would ask Your Honor to put a modification or

1  clarification that Mr. Seiden be allowed to work in the field

2  of sales or commodities with the consent of the U.S.

3  Attorney's Office and pretrial.  So only in the situation

4  where we've brought the job, as we have here, to the attention

5  of the U.S. Attorney's Office and the pretrial where they've

6  also cleared it, but I think that pretrial is nervous just

7  because a commodity is close to a security.

8          THE COURT:  What commodity are we talking about?

9          MS. VON DORNUM: This is silver, gold, metals, but

10 the actual tangible commodity.

11         THE COURT:  And has his potential employer been

12 informed of this job?

13         MS. VON DORNUM: Yes, Your Honor, and has spoken to

14 pretrial services, and it may not work out, but just so we

15 don't have to come back to you on specifics of this job, we

16 wanted to seek the modification now, but we'll wait to have it

17 fully authorized by both the government and pretrial before he

18 would again --

19         THE COURT: Mr. Klugman.

20         MR. KLUGMAN:  We agree to the modification.  We have

21 not at this point in time consented to him working at this

22 particular job.  We are still looking into the matter, but we

23 agree to the modification that he may work in the commodities

24 field if the government consents to the position.

25         THE COURT: Well, when I'm presented with some

1    specific information.

2              MS. VON DORNUM:  Would you prefer that I write to

3    you when we have an actual job offer at a particular place?

4              THE COURT:  Yes, and with some detail as to what the

5    job details, what the commodity is, and what pretrial

6    services, and the government being aware of it and their input

7    on it.

8              MS. VON DORNUM:  Yes.

9              THE COURT: Anything else?

10             MR. KLUGMAN:  That is all from the government.

11             THE COURT:  All the terms of bail to be continued,

12   whatever they are?

13             MR. KLUGMAN:  Yes.

14             MS. VON DORNUM:  Yes, Your Honor.

15             THE COURT:  So ordered.

16             Thank you, very much.

17             MR. KLUGMAN:  Thank you.

18             (Proceedings adjourned as above set forth)

19                 *   *   *   *   *   *   *   *   *

20

21

22

23

24

25